**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | |
|---|---|
| **CONNIE L. JACKSON,** ***on behalf of herself and all similarly situated individuals,***<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TRANS UNION, LLC,**<br><br>**Defendant.** | **Civil Action No. 3:24-cv-1069-FDW-DCK** |

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. OVERVIEW

Defendant Trans Union, LLC ("TransUnion") sold near a million private consumer reports to a man who had no income, no business, no references and no work phone. That man, Mitchell Evans (d/b/a Liberty Credit Management"), bought highly regulated reports from the home address he rented using a generic e-mail address and his cell phone. At each of five "credentialing" dates, TransUnion ignored its own Dunn & Bradstreet results, its own background check, criminal records, civil judgments, consumer lawsuits, a Federal Trade Commission CID and even this lawsuit. Management told employees, "Its business as usual." In hindsight TransUnion now knows that the FTC closed Evans down and he has taken the Fifth. There is no dispute about that. What is in dispute is whether the many red flags – individually and in context – prevented TransUnion from reaching a reasonable conclusion that Evans was who he said he was and his promise to obey the FCRA would be honored. Put more simply, even assuming TransUnion had a belief that Evans would do as he claimed, was that belief "reasonable?" (15 U.S.C. § 1681b(a)). And assuming it held such a belief, though in hindsight mistaken, did it occur despite TransUnion's following of "reasonable procedures" designed to prevent people like Evans from obtaining consumer reports? (15 U.S.C. § 1681e(a).

These dispositive questions – whether a belief and procedures were reasonable – are quintessentially questions of fact.

## II. PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS.

"When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party." *McDaniel v. Liberty Mut. Ins. Co.*, 2024 WL 3647655, at *2 (W.D.N.C. Aug. 2, 2024), *aff'd,* No. 24-1797, 2025 WL 586349 (4th Cir. Feb. 24, 2025). "In the end, the question posed by a summary judgment

motion is whether the evidence as applied to the governing legal rules 'is so one-sided that one party must prevail as a matter of law.'" *Id*. (cleaned up).

Defendant's factual assertions are concerning.[1] First, they ignore the "light most favorable" deference, instead aggressively restating and characterizing the disputed record into argument rather than fact. And second, TransUnion's facts too often mischaracterize the exhibit or testimony identified in support.

## A. TransUnion Exaggerates and Misstates its General Credentialing Process

Most of Defendant's explanation of its credentialing process (Def. 3-5) is mere argument ("robust", "proactively", "ensures", "ensures …accurate and verified data" or "designed to ensure."). There are several evidentiary means to know what its actual procedures were relevant to this case: the three documents cited by TransUnion (D1–3), deposition testimony, and real-world implementation of the policies in this case.

Defendant's officious "guides" reduce largely to a checklist of basic items its hurried employee and outsource vendor are to collect and checkoff. In fact, the larger document cited, D-1, itself dated 2020 (6 years after Evans was credentialled) is not in practice used. **Ex. 1**, Morash Dep. 92:5–22 [redacted]

TransUnion argues as fact that its "credentialing process verifies a permissible purpose" Def. 4. Defendant, however, has no basis to believe its procedures actually accomplish that goal. [redacted]

[1] Plaintiff responds using the Defendant's pagination, and as "Def. [page number]." Plaintiff also tries to track TranUnion's structure so disputed facts may be more easily considered.

[redacted]. **Ex. 2**, TU 30(b)(6) (Merits) Dep. 47:10–48:13.

TransUnion's procedures are far below "Industry Standards." Contrary to its claims of "robust policies and procedures consistent with industry-wide standards"[2] for credentialing and re-credentialing (Def. 8), [redacted] highlight the lackadaisical, rudimentary nature of TransUnion's approach. **Ex. 3**, [redacted]_4–5; 18–19; 21–22; 28–30; 40–41; 50; 59; 63; 77–79; 78–92; 97–103. TransUnion *never* requires ownership of debt or "authority to collect" documentation. **Ex. 4**, Hankins Dep. 41:14–21, 93:14–20; **Ex.2**, TransUnion 30(b)(6) (Merits) Dep. 54:7–55:9. In contrast, [redacted]. **Ex.3**, [redacted]_40–41. [redacted] **Ex. 2**, TransUnion 30(b)(6) (Merits) Dep. 56:3–57:5; **Ex. 1**, Morash Dep. 31:4–8; **Ex. 5**, TU - JACKSON 435–436, 505. It has no credentialing policies specific to debt buyers or debt collectors. **Ex. 1**, Morash Dep. 133:7–16, 139:10–20. [redacted]" **Ex. 3**, [redacted]_4–5, 21 [redacted] **Ex. 3**, EXP-JACKSON_4. TransUnion quickly approved Evans's rental home-based operation. **Ex. 5**,

---

[2] [redacted] **Ex. 2**, TransUnion 30(b)(6) (Merits) Dep. 44:23–45:9.
[3] Equifax has not yet responded to Plaintiff's timely subpoena.

TU – JACKSON 476–477, 490, 505, 9998–10001, 10961–10962, 10964–10965. [redacted]” **Ex. 3**, [redacted]_28–30. [redacted] **Ex. 3**, [redacted]_18–19, 40[redacted] **Ex. 3**, [redacted]_63. [redacted] **Ex. 3**, [redacted]_63. [redacted] **Ex. 3**, [redacted]_30. [redacted] **Ex. 3**, EXP-JACKSON_30. [redacted]. **Ex. 3**, [redacted]_77–79.

**B. Evans Creates a Name (“Liberty”), Applies to TransUnion and then Creates a Skeleton Business. In that Order.**

Nothing about 2014 Evans suggested a reason to believe he was reliable and honest. Anything more than a cursory review would have prevented any reason to believe that TransUnion could rely on his drop-down menu and paper “certification.”




**Ex. 6**, TRADS_70.

In July 2013, Evans's former landlord, Sheri Steiner, filed a Complaint for Breach of Commercial Lease, Rent and Damages in Los Angeles County Superior Court (the "Lease Lawsuit"). **Ex. 7**, Plaintiff_Jackson_2232–2266. Evans guaranteed a lease for a marijuana dispensary location operated by Cornerstone Health & Wellness, Inc. ("Cornerstone"). **Ex.7**, Plaintiff_Jackson_2238–2257 (lease), 2181 (acknowledging illegal operation of dispensary). He listed $200.00 in a Bank of America account as his sole asset and monthly expenses of $330.00. **Ex. 7**, Plaintiff_Jackson_2226. He declared he did "not have enough income to pay for my household's basic needs *and* the court fees." **Ex. 7**, Plaintiff_Jackson_2225. The letter Evans received from the United States Attorney's Office for the Central District of California on June 11, 2013 threatening criminal prosecution was in the file. **Ex. 7**, Plaintiff_Jackson_2185–2186, 2191–2192. Evans suffered a judgment for $117,729.52 and another for over $17,000 in attorney's fees, which to date have not been paid. **Ex. 7**, Plaintiff_Jackson_1976–1979, 2082–2083, 2070–2071, 2086–2087, 2126–2129, 2138–2140, 2149, 2155. All these records were publicly accessible.

Evans failed to pay taxes for several years, and TransUnion never requested his tax returns. **Ex. 7**, Plaintiff_Jackson_827-845 ("Receiver Report") at 8; **Ex. 5**, TU – JACKSON 474–475 (no reference to tax returns on TransUnion "MWR: Membership Checklist").

TransUnion's account of its 2014 credentialing (Def 6-7) is bereft of contextual facts. First, while an advocate can label as they choose in argument, it is misleading to refer to TransUnion's customer Evans as a corporate entity, "Liberty" (or Evans's other dba "Blackwater.") (There was no such relevant party until a November 2024 credentialing of a Liberty corporate entity.) As TransUnion notes, Evans was a sole proprietor.[4] There is not even evidence of any assumed name certificate.[5] Evans created his "business" entirely for the purpose of satisfying TransUnion's lax procedures. Almost immediately after his unsuccessful marijuana dispensary and while still broke, Evans came up with "Liberty Credit Management."[6] He applied for a local business license in conjunction with applying with TransUnion. **Ex. 5**, TU – JACKSON 476–477, 499.

[redacted] **Ex. 5**, TU – JACKSON 473, 476–477; **Ex. 8**, Steel Dep. 38:5–13, 39:2–13, 40:6–11.

Yes, TransUnion required a "lease." [redacted] **Ex. 5**, TU – JACKSON 476–477, 479–489. [redacted] **Ex. 5**, TU – JACKSON 479–489; **Ex. 5**, TU – JACKSON 505. [redacted] **Ex. 3**, Receiver Report, Plaintiff_Jackson_827–845. [redacted] **Ex. 5**, TU - JACKSON 505.

---

[4] Black's Law Dictionary (12th ed. 2024) A "Sole Proprietorship" is a "business in which one person … operates in his or her personal capacity."
[5] Required under California law. CAL. BUS. & PROF. CODE § 17910.
[6] When Plaintiff attempted to depose TransUnion's customer Evans, his lawyer stated in writing that his client was standing on his Fifth Amendment rights.

[redacted]. **Ex. 5**, TU – JACKSON 483–484. [redacted] **Ex. 5**, TU – JACKSON 476–477, 483. [redacted] with which TransUnion corresponded about credentialing. **Ex. 5**, TU – JACKSON 497–498.

[redacted] **Ex. 5**, TU – JACKSON 491. [redacted] **Ex. 5**, TU – JACKSON 491.

[redacted] **Ex. 5**, TU – JACKSON 493, 11110–11111.

[redacted] **Ex. 5**, TU – JACKSON 474–475. [redacted] **Ex. 5**, TU - JACKSON 505.

[redacted]. **Ex. 5**, TU – JACKSON 474–475; **Ex. 9**, Martin Dep. 18:5–21, 26:20–28:17, 43:2–44:14, 103:12–20, 105:7–17.[7] [redacted] **Ex. 9**, Martin Dep. 43:12–44:14.

[redacted] **Ex. 9**, Martin Dep. 46:2–20, 75:14–19; **Ex. 2**, TransUnion 30(b)(6) (Merits) Dep. 113:2–115:4; **Ex. 5**, TU – JACKSON 479–486. [redacted] **Ex. 9**, Martin Dep. 46:2–20, 75:14–19; **Ex. 2**, TransUnion 30(b)(6) (Merits) Dep. 110:5–111:11; 113:2–115:4.

None of the glaring deficiencies precluded Evans obtaining unfettered access to consumer reports—TransUnion accepted them and approved his application on October 10, 2014. **Ex. 5**, TU – JACKSON 474–477.

### C. TransUnion Perfunctorily "Re-Credentials" Mitch Evans in 2019 and 2021, Employing Even Shoddier Procedures Than In 2014 and Again Ignoring Multiple, Alarming Red Flags.

In 2019, TransUnion conducted what it what it characterized as a "re-credentialing" of Liberty. **Ex. 5**, TU – JACKSON 423–473. [redacted]

[7] Tina Martin, as of her deposition, served as advisor to TransUnion's customer credentialing and onboarding team and had previously served as manager to the credentialing and onboarding teams. **Ex. 9**, Martin Dep. 11:9–15.

[redacted] **Ex. 6**,TRADS_115–124. [redacted]" **Ex. 8**, Steele Dep. 35:16–36:18. [redacted] **Ex. 6**,TRADS_115, 117. [redacted] **Ex. 6**,TRADS_117, 119, 123. [redacted] **Ex. 6**,TRADS_118, 121; **Ex. 5**, TU – JACKSON 10920–10922; **Ex. 4**, Hankins Dep. 79:12–15.

[redacted] **Ex. 9**, Martin Dep. 115:3–19; **Ex. 5**, TU – JACKSON 435–436. [redacted] **Ex. 9**, Martin Dep. 115:20–116:4. [redacted] **Ex. 5**, TU – JACKSON 464–466. [redacted] **Ex. 5**, TU – JACKSON 451, 465. [redacted] **Ex. 5**, TU – JACKSON 435–436. [redacted]

---

[8] [redacted]. **Ex. 10**, July 22, 2025 E. Kosa Letter; **Ex. 4**, Hankins Dep. 30:3–9, 31:10–14, 73:12–18, 84:19–85:8, 87:17–19; 89:1–25; **Ex. 5**, TU – JACKSON 10915.

[9] [redacted] **Ex. 6**, TRADS_66.

[redacted] **Ex. 6**,TRADS_65–68. [redacted] **Ex. 5**, TU – JACKSON 435, 450, 464–465, 508–526. [redacted] **Ex. 5**, TU – JACKSON 452, 466. [redacted] **Ex. 5**, TU – JACKSON 435–436. [redacted]. **Ex. 6**,TRADS_111–112. In fact, Bank of America twice filed collection actions against Evans in Orange County Superior Court. **Ex. 7**, Plaintiff_Jackson_002392–002404, all publicly accessible. [redacted] returned two criminal records for Evans from Orange County, California and identified the judgments granted against him in the Lease Lawsuit. **Ex. 5**, TU – JACKSON 424-434 at 426, 429–430. [redacted] **Ex. 5**, TU – JACKSON 466.

TransUnion then almost entirely ignores 2021. On March 15, 2021, [redacted] **Ex. 5**, TU – JACKSON 9914–9915, 11003–11004. [redacted]. **Ex. 5**, TU – JACKSON 10964–10965. [redacted]

[redacted] **Ex. 5**, TU – JACKSON 10964–10965. [redacted] **Ex. 5**, TU – JACKSON 10967. [redacted]. **Ex. 5**, TU – JACKSON 10967–10971. [redacted] **Ex. 5**, TU – JACKSON 11001. [redacted] **Ex. 5**, TU – JACKSON 11054–11064 at 11059. [redacted]. **Ex. 5**, TU – JACKSON 11003–11004, 11012–11017 at 11012. [redacted] **Ex. 5**, TU – JACKSON 11065. [redacted] **Ex. 5**, TU – JACKSON 9826–9889 at 9840–9876, 9880–9887, 9888.

Nothing changed.

**D. The Reports Defendant Sold to Evans Were FCRA-Regulated "Consumer Reports."**

[redacted]. **Ex. 11**, TransUnion 30(b)(6) (Class) Dep. 11:9-13, 13:13-17, 26:14–27:9, 46:10-19. One of those reports was regarding Plaintiff, Connie Jackson.

TransUnion now manufactures a claim that "Liberty purchased CashNet accounts in February 2022." There is no admissible evidence that this is true. Plaintiff objects to such evidence

pursuant to Fed. R. Civ. P. 56(c)(2). Neither Party was able to obtain testimony or authentication of such supposed purchase in this action. Further, TransUnion's Rule 30(b)(6) testimony was unqualified: [redacted] **Ex. 2**, TransUnion 30(b)(6) (Merits) Dep. 56:3-12.

[redacted]. **Ex. 5**, TU – JACKSON 9826–9889 at 9841, 9852– 9853, 9864–9865, 9876; **Ex. 7**, Plaintiff_Jackson_2292–2295 (no "Apex Recovery Group, LLC" registered with New York Department of State), 2405 (MRACQ, LLC incorporated by Michael Schrader, signer at TU – JACKSON 9850, 9876 for "MRACQ, Inc.", on April 4, 2018), 2531–2533 (MRACQ, LLC administratively dissolved in September 2019), 3272 (no service of TransUnion subpoena to MRACQ, Inc. because many virtual clients for address but no MRACQ, Inc.), 3273 (no service of TransUnion subpoena to Apex Resolutions Group, LLC because service location "is a gated self-storage facility.")

Even when TransUnion asked about such supposed debt purchases when Evans was applying to furnish data, [redacted]. **Ex. 5**, TU – JACKSON 9914–9915, 9926–9927, 11003–11004. [redacted]

[redacted] **Ex. 5**, TU – JACKSON 11018–11053 at 11029, 11041, 11053.

As far as Ms. Jackson—no, she did not have an account with CashNet that could possibly have been collectible. Plaintiff owed nothing to "Blackwater Legal Group", Cashnet USA, the Cumberland County Sheriff, or anyone else regarding this scam. **Ex. 12**, Pl's Answer TransUnion Interrog. No. 10.

## E. TransUnion Facilitated Evans's Collections Fraud Against Ms. Jackson

Unlike TransUnion, Ms. Jackson had no connection to or knowledge about Evans or his d/b/as Liberty and Blackwater.

None of this Section—whether or not disputed—is relevant. TransUnion has not here challenged injury and harm or otherwise denied in discovery or depositions that what it sold to TransUnion was a FCRA-regulated consumer report. Plaintiff does not dispute that there is not admissible evidence in this case that Evans "disclosed Blackwater's existence to TransUnion." Def. 12. But Defendant's asserted facts continue to assume a falsehood. There is no Blackwater just as there was no Liberty. But as below, there was significant publicly available evidence that a CRA such as TransUnion, in its highly regulated field, had access to and ignored. *See* III. *infra*.

In September 2022, Plaintiff received a scam collection letter (the "Scam Collection Letter") from "Blackwater Legal Group." **Ex. 7**, Plaintiff_Jackson_1121–1122; **Ex. 13**, Jackson Dep. 70:5–8. The Scam Collection Letter contained multiple abusive and outright false statements:


CIVIL LAWSUIT NOTIFICATION

BLACKWATER LEGAL GROUP
OFFICIAL BUSINESS

Creditor: CASHNET USA
Type: LINE OF CREDIT

Additional Activity: NSF FRAUD

Defendant: CONNIE L. JACKSON

RESPONDENT
[redacted]

For questions, please call:

NOTIFICATION OF LAWSUIT & CIVIL COMPLAINT

FILED

Detach and Return With Your Payment

Make payable to:

BLACKWATER LEGAL GROUP

[redacted]

**Ex. 7**, Plaintiff_Jackson_2.

After receiving the Scam Collection Letter, Jackson obtained her TransUnion credit report and learned of the inquiry from "Liberty Credit Management." **Ex. 7**, Plaintiff_Jackson_000022; **Ex. 13**, Jackson Dep. 69:12–69:17. [redacted] **Ex. 11**, TransUnion 30(b)(6) (Class) Dep. 34:9-37:12.

TransUnion's facts in this section are even more misdirecting than in others. [redacted]. **Ex. 10**, July 22, 2025 E. Kosa Letter; **Ex. 4**, Hankins Dep. 30:3–9, 31:10–14, 73:12–18, 84:19–85:8, 87:17–19; 89:1–25; **Ex. 5**, TU – JACKSON 10915. [redacted]

[redacted]. **Ex. 6**, TRADS1–42.[10] TransUnion asserts that TRADS sells its non-FCRA products, and Trans Union, LLC sells its regulated FCRA products. Likely, Evans mailed letters to multiple addresses.

Similarly, TransUnion's statement that it does not show a Richmond address for Liberty misdirects from its counsel's full knowledge that that P.O. Box, as others in different regions, was Evans's manner of operation. And of course, TransUnion did not show a CashNet account in Plaintiff's TransUnion file—she did not owe one. Evans did not report the debt to TransUnion—that was obviously a fraudulent threat.

[redacted] **Ex. 5**, TU – JACKSON 418–419; **Ex. 11**, TransUnion 30(b)(6) (Class) Dep. 11:2–13, 13:13–17, 15:7–12, 16:1–18:8, 26:25–27:9, 41:5–16, 46:10–19; **Ex. 5**, TU – JACKSON 2721, 2743, 2777–2778, 2785–2790, 3019, 3068, 3080, 3243–44, 3279–3280, 3311–3312, 3328–3329, 3379 [redacted] TU – JACKSON 418–419).

## F. If It Had Looked (or Cared), TransUnion Had Notice Sufficient to be Suspicious of Mitch Evans from 2014 Forward.

[10] This statement is not contestable. Both Parties have the same documents. Plaintiff is not attaching the TLO report to avoid having to redact 42 pages of identifying information.

TransUnion claims to have been just as surprised as anyone that Evans d/b/a Liberty, d/b/a Blackwater d/b/a Verity Legal group was the fraudster we all now know he was. Def. 15–16. It should not have been. In addition to all that has been detailed above, there were other red flags throughout the TransUnion-Evans business relationship.

[redacted] **Ex. 5**, TU – JACKSON 477. [redacted] **Ex. 5**, TU – JACKSON 9462, 11098–11107, 11545 (converted from Excel to PDF for filing); **Ex. 4**, Hankins Dep. 113:23-114:8; *see also* **Ex. 11**, TransUnion 30(b)(6) (Class) Dep. 34:9–37:1 [redacted] **Ex. 5**, TU – JACKSON 11545; **Ex. 2**,TransUnion 30(b)(6) (Merits) Dep. 54:7–55:9; 79:11–80:13, 87:24–88:17. [redacted] **Ex. 2**,TransUnion 30(b)(6) (Merits) Dep. 79:11–80:13, 87:24–88:17. [redacted] **Ex. 5**, TU – JACKSON 11545; **Ex.2**, TransUnion 30(b)(6) (Merits) Dep. 130:4–9, 131:12–132:1. TransUnion sold Evans in his home, on his cell phone and with no evidence of account ownership or actual lawful business credit reports on roughly 1 in 200, or .5% of Americans in its system. And even through today, TransUnion does not think that remarkable.

Numerous public actions—private civil and governmental, and the BBB complaints TransUnion tries to preempt (Def. 16 n.5) reference Evans by name and regardless of what made-up d/b/a he also used. The only way it could ignore actions of which it otherwise had knowledge

was by willful blindness. TransUnion collects public records—judgments—through its affiliate and jointly operated TRADS. On November 4, 2020, Michael Lebeda filed a lawsuit, styled *Michael Lebeda v. Verity Legal Group*, No. 8:20-cv-2128-JLS-KES (C.D. Cal.) ("*Lebeda*"). **Ex. 7**, Plaintiff_Jackson_2320–2327. The Complaint in *Lebeda* attached as an exhibit a scam dunning letter from "Verity Legal Group" strikingly similar to the letter Plaintiff received from "Blackwater Legal Group." **Ex. 7**, Plaintiff Jackson_1121, 2321. On September 17, 2021, Mr. Lebeda filed a proposed Amended Complaint in *Lebeda* naming Evans as an additional defendant, and then filed the Amended Complaint ten days later, again attaching the scam letter from "Verity Legal Group." **Ex. 7**, Plaintiff_Jackson_2349–2377. The Amended Complaint stated that "MITCHELL EVANS, doing business under the unregistered fictitious business name of VERITY LEGAL GROUP, is … responsible for the policies and procedures of VERITY LEGAL GROUP." **Ex. 7**, Plaintiff_Jackson_2369. The proof of service on Evans, filed in December 2021, as in the Bank of America collection actions, noted evasion in avoiding service. **Ex. 7**, Plaintiff_Jackson_2378–2381. On December 28, 2021, the Clerk entered default against Evans. **Ex. 7**, Plaintiff_Jackson_2378–2388.

On March 8, 2022, Matthew Penning filed a lawsuit, styled *Matthew Penning v. Liberty Legal Group Inc.*, *Liberty Credit Management Inc.*, and *Mitchell Steven Evans*, No. 1:22-cv-204-HYJ-SJB (W.D. Mich.) ("*Penning*"). **Ex. 7**, Plaintiff_Jackson_2407–2467. The Complaint in *Penning* contained detailed information regarding the operation of Evans's scam, including his use of fake names and websites like "Liberty Legal Group" to scam consumers for phantom debts. **Ex. 7**, Plaintiff_Jackson_2409–2416. The Complaint in *Penning* attached as an exhibit a scam dunning letter from "Liberty Legal Group" strikingly similar to the letter Plaintiff received from

"Blackwater Legal Group." **Ex. 7**, Plaintiff Jackson_1121, 2464–2465. The Court entered default judgment. **Ex. 7,** Plaintiff Jackson_2741.

On March 2, 2023, the California Department of Financial Protection and Innovation issued a Desist and Refrain Order and Order Assessing Penalties (the "Desist and Refrain Order") against Evans. **Ex. 7**, Plaintiff_Jackson_3273–3295. [redacted] **Ex. 5**, TU – JACKSON 11113–11130. [redacted] **Ex. 5**, TU – JACKSON 11131–11234; **Ex. 2**, TransUnion 30(b)(6) (Merits) Dep. 90:7–92:11.[11]

Plaintiff then filed her lawsuit on August 12, 2024 and served TransUnion on October 1, 2024. Document Nos. 1, 5. [redacted] **Ex. 4**, Hankins Dep. 113:23–114:8; **Ex. 2**, TransUnion 30(b)(6) (Merits) Dep. 89:2–20. [redacted]. **Ex. 5**, TU – JACKSON 11545; **Ex. 2**, TransUnion 30(b)(6) (Merits) Dep. 89:2–20.[12]

---

11 [redacted] **Ex. 2**, TransUnion 30(b)(6) (Merits) Dep. 92:3–7. The CID requests confidentiality regarding the CID and the FTC's investigation of TransUnion but then states, "[i]f *you choose* to take any action that could alert the target(s) to the investigation (such as suspending services), please contact FTC counsel before taking any such action." **Ex. 7**, Plaintiff Jackson 11113 (emphasis supplied).

12 TransUnion has not challenged willfulness, 15 U.S.C. § 1681n, in its motion, but the Court should note that a refusal to correct even after suit is patently willful. *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 153 (4th Cir. 2008).

[redacted] **Ex. 5**, TU-JACKSON 528–558. [redacted] **Ex. 5**, TU-JACKSON 556. [redacted]. **Ex. 5**, TU – JACKSON 11054–11064 at 11059, 11059.

The FTC, on February 24, 2025, filed a Complaint for Permanent Injunction, Monetary Judgment, and Other Relief in the U.S. District Court for the Central District of California (the "Central District of California"), naming Evans, Ryan Evans, and LCM Inc. as defendants. *Federal Trade Commission v. Blackrock Services, Inc., et al.*—No. 8:25-cv-363-HDV-(ADSx). The FTC alleged: "[s]ince at least 2020, Defendants have engaged in a scheme to defraud consumers using sensitive consumer information to collect payments for debts that consumers do not actually owe or that Defendants do not have authority to collect." **Ex. 7**, Plaintiff_Jackson_121–150 at ¶ 18. On February 27, 2025, the Central District of California entered a Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, and Other Equitable Relief, and Order to Show Cause (the "TRO Order") as to the Defendants in *FTC v. Blackrock*. **Ex. 7**, Plaintiff_Jackson_691–726. [redacted] **Ex. 2**, TransUnion 30(b)(6) (Merits) Dep. 130:4–9, 131:12–25. [redacted] **Ex. 8**, Steel Dep. 16:16–17:7. Joe Hankins learned of the enforcement action in the week before his deposition on July 1, 2025. **Ex. 4**, Hankins Dep. 37:6–13.

## III. ARGUMENT AND AUTHORITIES.

### A. The Question is Whether TransUnion's Belief Was Reasonable.

One of the primary reasons for enactment of the FCRA was protection of confidential information and individual privacy. As oft cited, the FCRA's enacted purpose is "to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681. As courts have recognized, "[a] major purpose of the [FCRA] is the privacy'' of consumer data. *Trans Union Corp. v. FTC*, 81 F.3d 228, 234 (D.C. Cir. 1996). The statute was enacted to "prevent an undue invasion of the individual's right of privacy in the collection and dissemination of credit information.'' S. Rep. No. 91–517, at 1 (1969).

When Senator Proxmire first introduced S. 823, the bill which ultimately became the Fair Credit Reporting Act, he stressed the importance of assuring this confidentiality:

> The fact that credit reporting agencies maintain files on millions of Americans, including their employment, income, bill paying record, marital status, habits, character and morals is not in and of itself so disturbing. …. What is disturbing is the lack of any public standards to ensure that the information is kept confidential and used only for its intended purpose. The growing accessibility of this information through computer- and data-transmission techniques makes the problem of confidentiality even more important.

115 Cong. Rec. 2413 (1969); *see also* 114 Cong. Rec. 24,903 (1968) (remarks of Sen. Proxmire). From these initial concerns, the FCRA emerged with specific restrictions on the release of consumer reports. "In enacting the FCRA, Congress set a high standard of behavior for credit reporting agencies to follow because "[t]here is a need to insure that consumer reporting agencies exercise their *grave responsibilities* with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4) (emphasis added)." *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1007 (D. Ariz. 2006).

"In the exercise of their 'grave responsibilities,' consumer reporting agencies are prohibited under FCRA from furnishing the confidential information in 'a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681b of this title.' *Id.* § 1681e(a). Moreover, "every [agency] shall make a reasonable effort to verify . . . the uses certified . . . prior to furnishing such user a consumer report.' *Id.*" *Levine v. World Fin. Network Nat. Bank*, 437 F.3d 1118, 1121 (11th Cir. 2006)

The Parties agree that the question under § 1681b is whether TransUnion had reason to believe that Evans would use Defendant's reports for a lawful purpose—in this context, "in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the . . . collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A). And the question under § 1681e(a) as to Evans is whether TransUnion "maintain[ed] reasonable procedures designed to . . . limit the furnishing of consumer reports" for that purpose. 15 U.S.C. § 1681e(a).

To its credit, in TransUnion's argument, it does not defend Evans's misconduct. It does not suggest, let alone argue that Evans used the Plaintiff's and class members' reports for a lawful purpose. Instead, Defendant is arguing that while Evans may have known of his criminal intent, it did not. There are multiple ways to characterize that defense, but they all leave us in the same place. Did TransUnion have an affirmative reason to believe that Evans was what he said he was and would use the reports as he claimed—for lawful collection of credit accounts owed by the consumer?

Section 1681b(a) requires, in relevant part:

> (a)In general
>
> [A]ny consumer reporting agency may furnish a consumer report under the following circumstances and no other:

> (3) To a person which it has reason to believe—
> (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer[.]

TransUnion spends several pages arguing that the mere fact that Evans's use was not lawful is insufficient to state this claim. Def 18–19. This is not controversial. Even if the phrase "reason to believe" were not within § 1681b(a), the FCRA is not a strict liability statute. While TransUnion on Summary Judgment does not argue as to negligence and willfulness, an FCRA recovery always requires proof of such threshold. 15 U.S.C. §§ 1681n, 1681o. Whether the question is put as "reason to believe" or "was it unreasonable to believe," they mean the same thing. As a sister court explained:

> The Court views the reasonable belief standard in the context of this case not as a standalone or separate rule of law, but rather an alternative way of describing the intent requirement inherent in the FCRA. In other words, if a defendant establishes that it acted reasonably to inquire into a plaintiff's credit worthiness, it would appear to follow that the defendant did not act negligently or willfully to violate the statute. Absent establishment of negligence or willfulness, a plaintiff could not succeed on their claim. Therefore, guided by the relevant FCRA provisions, the Court finds it must focus at this juncture on whether Defendant (1) accessed Plaintiff's consumer credit report without a permissible purpose and (2) whether a jury could determine that Defendant did so negligently or willfully. Because Plaintiff has identified facts from which a jury could find that Defendant did not have a permissible purpose for obtaining Plaintiff's credit report, and because Plaintiff has also identified facts from which a jury could determine Defendant acted negligently or willfully, summary judgment must be denied.

*Reilly v. Vivint Solar*, No. 1:18-CV-12356-NLH-JS, 2021 WL 261084, at *6 (D.N.J. Jan. 26, 2021).

**B. Merely Stating "Collection" as an Intended Use is Not Per Se Lawful.**

The facts stated above are from any vantage—and even more so in the light most favorable to Ms. Jackson—sufficient for a jury to find that TransUnion did not a have a reasonable basis to blindly believe Evans's "I promise not to break the law" certification. Yes, he said he was opening

a "collections" business. But "collection" is not a permissible purpose in a number of circumstances. For example, most courts have held that collection is not a permissible purpose for obtaining a consumer report once the account is no longer collectible. *See Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 WL 561336, at *5 (W.D. Ky. Feb. 10, 2017). "Of course, for the debt-collection permissible purpose to apply, an outstanding debt must actually exist. *See Rodgers v. McCullough*, 296 F. Supp. 2d. 895, 900 (W.D. Tenn. 2003)." *Id.* The FTC has similarly explained, "Once an account is paid off and closed, the creditor does not have a permissible purpose for obtaining a consumer report from a CRA because there no longer exists any account to 'review.'"[13] FTC Report at 45.

Evans proves that point. His letter to Ms. Jackson and other consumers was an attempt to collect. But not a lawful one and not of a debt anyone owed. Without TransUnion's hoped-for "per se" entitlement, the facts detailed above easily prevent judgment as a matter of law.

The "reason to believe" is also an affirmative burden for TransUnion. But TransUnion has had difficulty in this case and in its business process generally at understanding why "reason to believe" is not the same thing as "no reason to disbelieve." The FCRA's privacy pillar does not allow a company in what Defendant itself concedes is a "highly regulated" industry to furnish private consumer reports to any person who wants to buy them merely because TransUnion does not possess any negative opinion about the user. The opposite is true. Tie goes to consumer privacy. Suspicion, uncertainty, or merely lack of any knowledge all bar the sale of consumer reports.

## C. TransUnion Must Also Follow "Reasonable Procedures."

[13] The Federal Trade Commission, previously the lone FCRA enforcement voice, compiled all previous interpretations into Federal Trade Commission, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations* (2011), available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf. ("FTC Report")

In addition to § 1681b(a), TransUnion is also legally bound to comply with § 1681e(a), which states in relevant part: "Every consumer reporting agency shall maintain reasonable procedures designed to … to limit the furnishing of consumer reports to the purposes listed under section 1681b of this title." This claim is pled as Count II. That, by itself, is an obligation a jury could (should) find TransUnion has not met. Whether standing alone, or stacked against competing alternatives, such as Experian, TransUnion's procedures are not designed to do any meaningful to prevent the furnishing of reports to Evans and users like him.

But § 1681e(a) goes further and adds some specific requirements—not as a substitute or in full satisfaction of the "reasonable procedures" obligation, but in addition to it. Such procedures must include identification of the user and certification of lawful use. Here, it appears TransUnion only did the latter. Section 1681e(a) also provides that, a consumer reporting agency must "make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report. No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681b of this title." 15 U.S.C. § 1681e(a).

So what procedures are reasonable? What procedures are designed to prevent users such as Evans from obtaining TransUnion reports? That will be a jury question. It is clearly not one appropriately decided as a matter of law. Given the practical examination of TransUnion's procedures vis-à-vis Evans, it is clear that those procedures will not ensure compliance, and yet TransUnion has not changed them.

The most obvious problem with TransUnion's procedures is that they are pro forma. Defendant's in-house legal team likely developed a list of items to add to a checklist, with that

checklist itself the only objective. Real site visits, online and community searches, meaningful reference checks—yes, those are all necessary. But that is because they serve an objective of searching for variances from the norm. Here there were plenty of such variances, what we titled red flags. TransUnion's procedures ignored all of them. The FTC explained, "What constitutes adequate verification will vary with the circumstances." FTC Report at 65. For example, it might be appropriate to "require an on-site visit to the user's place of business, a check of the user's references, confirmation of the business identity of the applicant (e.g., via phone directories or publicly available data such as governmental licensing information), and examining applications and supporting documentation supplied by applicants, or other reasonable methods" for the purpose of "detect[ing] suspect representations, discrepancies, illogical information, suspicious patterns, factual anomalies, and other indicia of unreliability." *Id*. TransUnion's procedures did catch and detect all of those variances. But because all it was concerned about was its certification checklist, it still sold Evans his reports.

Beyond those general considerations, a jury would consider the resources put into the credentialing and monitoring process. *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1009 (D. Ariz. 2006).[14] ( "Given that Experian assigned only two staff members—neither of whom had more than a high school education or any training on permissible purposes under the FCRA—to review 200 applications per day, a jury could conclude that Experian acted recklessly by failing to grant its staff sufficient time to carefully review the applications in accordance with its grave responsibility to uphold the rights of consumers.").

**D. Absent Materially More, Mere "Certification" Does Not Provide a Reasonable Belief or Satisfy the Reasonable Procedures Requirement.**

---

14 [redacted]

Implicit—or even explicit—in TransUnion's motion is an assertion that it was reasonable in believing Evans would only use its reports for a lawful purpose merely because he signed a paper—real or electronic—promising to do only so. But TransUnion had no prior experience with Evans. No one did in this regard as he was "opening" his business step by step only as need to satisfy TransUnion. Evans sent back to TransUnion's credentialer only what he asked for—"We need a Bank Statement." Open an account. "We need an office." Rent a furnished cubicle and put a $5 plaque on the door. "We need a license." Go down to the local municipal building and get a $50 license. That all of these checklist items came after the TransUnion application and checklist is revealing. For Defendant, none of that really mattered so long as Evans "certified" that he would "not violate the law."

There are plenty of decisions that accept certifications as important. But all of those where vastly different than here. Each case considered a long-term relationship and a publicly recognized user.[15] The decisions with the deeper analysis and unblemished by odd facts almost uniformly find that mere certification by a user does not of itself provide a reason to believe or satisfy the

---

[15] Most of the decisions upon which TransUnion bases its defense are either not controversial or unhelpful. Its briefing strategy was to find select sentences to cite from favorable decisions, without regard to the facts or circumstances of such cases, or whether it is explained or reasoned. For example, the majority of Defendant's citations are to *pro se* outcomes. *See, e.g.*, *Alston v. Cent. Credit Servs., Inc.*, 2013 WL 4543364 (D. Md. Aug. 26, 2013); *Alston v. Creditors Interchange Receivable Mgmt., LLC*, 2012 WL 4370124 (D. Md. Sept. 21, 2012); *Bugoni v. Emp. Background Investigations, Inc.*, 2022 WL 888434 (D. Md. Mar. 25, 2022); *Kennedy v. Victoria's Secret Stores, Inc.*, 2004 WL 414808, at *3 (E.D. La. Mar. 3, 2004); *Klapper v. Shapiro*, 154 Misc. 2d 459, 463, 586 N.Y.S.2d 846, 849 (Sup. Ct. 1992); *Middlebrooks v. Sacor Fin., Inc.*, 322 F. Supp. 3d 1300 (N.D. Ga. 2018); *Pietrafesa v. First Am. Real Est. Info. Servs., Inc.*, 2007 WL 710197 (N.D.N.Y. Mar. 6, 2007). Others are addressing questions of whether a use is permissible in a claim against the "user" with a number of auto dealers. *See, e.g.*, *Anderson v. Ray Brandt Nissan, Inc.*, 1991 WL 211627, at *1 (E.D. La. Oct. 8, 1991); *Dobson v. Holloway*, 828 F. Supp. 975 (M.D. Ga. 1993); *Enoch v. Dahle/Meyer Imports, L.L.C.*, 2007 WL 4106264 (D. Utah Nov. 16, 2007); *Jenkins v. RJM Acquisitions, LLC*, 2013 WL 589006, at *3 (W.D.N.C. Feb. 14, 2013); *Korotki v. Att'y Servs. Corp. Inc.*, 931 F. Supp. 1269 (D. Md. 1996). Most of the *pro se* cases are also in that group.

"reasonable procedures" obligation. "Under the plain terms of § 1681e(a), a subscriber's certification cannot absolve the reporting agency of its independent obligation to verify the certification and determine that no reasonable grounds exist for suspecting impermissible use. Blanket certification cannot eliminate all genuine issues of material fact with regard to Experian's liability." *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 677 (9th Cir. 2010) (cleaned up). TransUnion's 'certification alone' policy has been similarly rejected:

> Although Plaintiff has not alleged that Trans Union wholly failed to require that Midland certify that its purpose for obtaining Plaintiff's report was permissible, based on the facts alleged in the Amended Complaint, even assuming Trans Union required such certification, any facially valid certification would have been insufficient to protect against the possibility that Midland did not have a proper purpose in obtaining a copy of Plaintiff's consumer report. These facts, if true, are sufficient to state a claim for violation of § 1681e. *Cf. Levine v. World Fin. Network Nat. Bunk,* 437 F.3d 1118, 1121 (11th Cir. 2006) (rejecting argument that CRA's "grave responsibility for safeguarding [a consumer's] confidential information extends only so far as a former creditor's facially valid request for a credit report, notwithstanding any reasonable grounds to believe that the request is instead made for an impermissible purpose").

*Alston v. Branch Banking & Tr. Co.*, No. GJH-15-3100, 2016 WL 4521651, at *9 (D. Md. Aug. 26, 2016). "Section 1681e requires more from a credit reporting agency than merely obtaining a subscriber's general promise to obey the law." *Pintos*, 605 F.3d at 677.

## E. "Reasonableness" (Reason to Believe, § 1681b(a), and Reasonable Procedures, § 1681e) is Nearly Aways a Question for the Jury

It is nothing novel to find that questions of reasonableness are reserved for the jury. This is of course true as well in the context of the FCRA. Did TransUnion follow "reasonable procedures" sufficient to form a reasonable belief that Evans would use its reports only for a lawful purpose?[16]

[16] That is so patently a question of fact, that Plaintiff had to forgo filing her affirmative Rule 56 motion.

Reasoned Courts, including our own Court of Appeals, have emphasized this obvious conclusion. The issue of whether the agency failed to follow "reasonable procedures" will be a "jury question[ ] in the overwhelming majority of cases." *Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409, 416 (4th Cir. 2001) (quoting *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) ("The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases."). "[T]he reasonableness of a [CRA's] procedures is 'normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question.'" *Cortez v. Trans Union, LLC*, 617 F.3d 688, 709 (3d Cir. 2010) (quoting *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971 (7th Cir. 2004)). "And a jury must consider whether the defendant's procedures were reasonable *in context*, not in a vacuum." *Riddick v. Chex Sys., Inc.*, No. 2:24-CV-700, 2025 WL 2901542, at *2 (E.D. Va. Oct. 10, 2025) (citing *Andrews v. TRW, Inc.*, 225 F.3d 1063, 1068 (9th Cir. 2000), *rev'd and remanded, TRW Inc. v. Andrews*, 543 U.S. 19 (2001)).

## V. CONCLUSION

For the foregoing reasons, TransUnion has failed to show that it is entitled to judgment as a matter of law on Plaintiff's claims. Accordingly, Plaintiff asks the Court to deny Defendant's Motion for Summary Judgment.

Dated: November 7, 2025

Respectfully submitted,

**CONNIE L. JACKSON**

By: */s/ Leonard A. Bennett*

Brett E. Dressler
N.C. Bar No. 34516
**SELLERS, AYER, DORTCH & LYONS, P.A.**
301 S. McDowell Rd, Suite 410
Charlotte, NC 28204
704-377-5050
Fax: 704-339-0172

Email: bdressler@sellersayers.com

Drew D. Sarrett
(admitted *pro hac vice*)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
626 East Broad Street
Suite 300
Richmond, VA 23219
804-905-9900
Fax: 757-930-3662
Email: drew@clalegal.com

Leonard A. Bennett
N.C. Bar No. 21576
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Boulevard
Suite 1-A
Newport News, VA 23601
757-930-3660
Fax: 757-930-3662
Email: lenbennett@clalegal.com

Stephen Leigh Flores
(admitted *pro hac vice*)
**FLORES LAW, PLLC**
530 E. Main St.
Ste. 320
Richmond, VA 23219-2412
804-238-9911
Fax: 804-203-8717
Email: stephen@floreslawva.com

*Counsel for Plaintiff*

## CERTIFICATION PURSUANT TO STANDING ORDER REGARDING USE OF ARTIFICIAL INTELLIGENCE

Undersigned counsel certifies that no artificial intelligence was employed in doing the research for the preparation of this Memorandum, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg.

Every statement and every citation to an authority contained in this document has been checked by an attorney in this case as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

*/s/ Leonard A. Bennett*


Leonard A. Bennett
N.C. Bar No. 21576
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Boulevard
Suite 1-A
Newport News, VA 23601
757-930-3660
Fax: 757-930-3662
Email: lenbennett@clalegal.com

*Counsel for Plaintiff*