| | |
|---|---|
| CONNIE L. JACKSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM & ORDER** |
| ) | |
| TRANS UNION, LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER** is before the Court on Defendant Trans Union, LLC's Motion for Summary Judgment. (Doc. No. 70). For the reasons explained below, Defendant's motion is **DENIED**.

## I.    BACKGROUND

Plaintiff Connie L. Jackson alleges she was the victim of a debt collection scheme orchestrated by third parties. (Doc. No. 53 ¶¶ 5–6, 15). According to Plaintiff, as part of the scheme, Defendant Trans Union, LLC ("TransUnion" or "Defendant") furnished a consumer report about Plaintiff to non-party Liberty Credit Management ("Liberty") in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (the "FCRA"). *Id.* ¶¶ 26–33. Defendant has now moved for summary judgment on Plaintiff's claims. (Doc. No. 70). The record establishes, and the parties agree on or do not dispute, the following facts.[1]

---

[1] Although the Court summarizes the relevant facts, the Court does not (and need not) recite all facts the parties contend are applicable to the pending motion. The

1

### A. Defendant and Consumer Reports

Defendant is a national consumer reporting agency ("CRA") within the meaning of the FCRA. (Doc. No. 73 at 8); *see* 15 U.S.C. § 1681a(f). As a CRA, Defendant provides consumer reports to its customers under certain circumstances. *See* 15 U.S.C. § 1681b(a). Prior to providing the consumer reports, Defendant requires its new customers to go through its credentialing process. (Doc. No. 73-2 at 2). Among other things, this process seeks to ensure that all new businesses receiving FCRA regulated data have a permissible purpose to access the data. *Id.*

### B. Liberty's Relationship with Defendant

In September 2014, Liberty,[2] through its owner Mitchell Evans, applied to receive consumer reports from Defendant. (Doc. Nos. 73-4 at 4–6). Liberty represented that it was a collection agency and intended to use the consumer reports "[i]n connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of the consumer." (Doc. No. 111-5 at 11). Defendant and Liberty also entered into a Master Agreement for Consumer Reporting and Ancillary Services, effective September 12, 2014. (Doc. No. 73-6 at 2). In the agreement, Liberty made several broad or "blanket" certifications to Defendant. These included that (1) the nature of Liberty's business was debt collection; (2) Liberty would only request

---

Court further notes the parties appear to disagree on several facts. *See* (Doc. No. 121) (Defendant's Appendix discussing ten non-exhaustive examples of "misleading or incorrect statements of 'fact'").

[2] In 2014, Liberty was a sole proprietorship. (Doc. No. 73-4 at 22). Liberty later incorporated in January 2022. (Doc. No. 73-22 at 8).

2

consumer reports for permissible purposes under the FCRA; (3) Liberty would certify the permissible purpose for each consumer report it requested; and (4) Liberty would be responsible for its own compliance with all applicable laws, including the FCRA. *See* (Doc. Nos. 73-4 at 4; 73-6 ¶¶ 2, 3.3, 3.4, 5.5).

During the credentialing process, Liberty provided Defendant a copy of its lease for its business location, information regarding its business phone, bank account information, trade references, client references, its federal employer identification number, and a business tax certificate. (Doc. Nos. 73-4 at 15–35; 111-5 at 10). Defendant also obtained a credit report on Evans (Doc. No. 73-4 at 34) and had a third party inspect Liberty's office on-site on September 25, 2014. *Id.* at 7–14.

A review of Liberty's application and credentialing documentation from 2014 shows that at the time of Liberty's application, Evans informed Defendant that he had established the company on or about September 11, 2014, immediately prior to applying. *Id.* at 4. When Defendant requested a "Federal Tax ID," Evans initially provided 12-3456789. (Doc. No. 111-5 at 8).[3] Although Evans eventually supplied an email with a business domain, Evans originally provided a Gmail account address, which he used to correspond with Defendant during the credentialing process. *Id.* at 9, 16. A printout of Liberty's bank account information, dated October 1, 2014, showed a single deposit of $100 from a "Counter Credit" on September 12, 2014. *Id.* at 10. Defendant was unable to validate or locate two of the three client references provided

[3] Evans later received a notice from the IRS dated September 16, 2014, assigning an Employer Identification Number for Liberty Credit Management. (Doc. No. 111-5 at 19).

by Evans. (Doc. Nos. 73-4 at 21; 73-8 at 2–3; 111-5 at 154–55). Defendant's Membership Checklist for Liberty's application reflects the following:

- Liberty was not listed in 411 or an online directory;

- Liberty did not provide a website address;

- Liberty was not listed with the Better Business Bureau; and

- no website for Liberty was located during an internet search.[4]

(Doc. No. 111-5 at 6–7).

Evans signed a lease for office space for Liberty on September 10, 2014. (Doc. No. 73-4 at 15–17). The location consisted of approximately 212 square feet of office space for $339.00 per month. *Id.* at 15. The lease was on a month-to-month basis, and listed Evans, not Liberty, as the tenant. *Id.* Evans's 2014 credit report also included an "unpaid collection account." (Doc. No. 73-4 at 34). Public records available at the time of Liberty's application show Evans was the named defendant in a lawsuit in the Superior Court of California. *Steiner v. Cornerstone Health & Wellness, Inc.* (Super. Ct. L.A. Cnty., 2013, No. NC058980); (Doc. No. 109-8 at 118).[5] On March 5, 2014, judgment was entered against Evans for $116,659.50 plus costs. *Id.* at 103. As part of the *Steiner* lawsuit, Evans also filed a "Request to Waive Fees" in August 2013 asking the court to waive all court fees because he did not "have enough income to pay [his] household's basic needs and the court fees." (Doc. No. 109-8 at 116). The

---

[4] However, the third-party inspector's report from 2014 identified a website for Liberty. (Doc. No. 111-5 at 181).

[5] The record is unclear as to whether Defendant was aware of the lawsuit in 2014. *But see* (Doc. No. 73-7 at 9) (Comprehensive Report, dated June 19, 2019, referencing the judgment).

4

waiver shows Evans had only $200 in a Bank of America account and made a gross monthly income of $500. *Id.* at 116–17.

Defendant ultimately approved Liberty's application to receive consumer reports in or about October 2014. (Doc. No. 73-4 at 2–3).

After doing business together for several years, Defendant recredentialed Liberty in 2019. *See* (Doc. No. 73-9). As part of this process, Liberty again affirmatively represented itself as a debt collector to Defendant and provided a copy of its local business license. (Doc. Nos. 73-9 at 18; 73-10 at 2–3). Defendant had a third party conduct a second on-site inspection of Liberty's office—the same location as in 2014. *See* (Doc. Nos. 73-4 at 7; 73-9 at 7–16). Defendant also reviewed Liberty's website and pulled Evan's credit report. (Doc. Nos. 73-9 at 20–30; 111-6 at 7–10). A Dun & Bradstreet report obtained in February 2019 identified Liberty as inactive, assigned Liberty a viability score of 0 or "OUT OF BUSINESS OR UNABLE TO CONFIRM DESIGNATION," and noted "D&B is unable to confirm active operations at a specific location due to the business showing limited to no business activity and multiple signs of inactivity (e.g. disconnected phone, vacate address, no longer in a telephone directory etc.)." (Doc. No. 111-6 at 2–3). Ultimately, Liberty passed Defendant's recredentialing process. (Doc. No. 73-9 at 2).

In 2020, Liberty applied to furnish consumer credit information to Defendant in addition to obtaining credit reports. (Doc. No. 73-11 at 13–16). As part of that process, on November 25, 2020, Liberty recertified that it was a sole proprietorship in the business of collections. *Id.* at 5–6. Liberty also submitted a copy of its local

business tax certification, which noted Liberty was a "collection agency." *Id.* at 7. Liberty provided Defendant with three agreements reflecting Liberty's purchase of accounts for collections. *Id.* at 59–94.

Defendant has no record of receiving any complaints, challenges, disputes or concerns from other consumers about Liberty or Mitchell Evans from 2014 until August 19, 2022. *See* (Doc. No. 73-16 at 13–14).

### C. Plaintiff's CPE Report

On August 19, 2022, Liberty requested Plaintiff's Collection Prioritization Engine ("CPE") report (the "Report") from Defendant. (Doc. No. 73-15 at 2). As part of its request, Liberty certified that it would use Plaintiff's Report for debt collections. *See* (Doc. No. 73-14 at 62:8–23). Defendant provided Liberty a copy of the Report the same day. *See* (Doc. No. 73-15 at 2).

Shortly thereafter, Plaintiff received a letter from Blackwater Legal Group ("Blackwater"). (Doc. No. 73-18 at 2). According to the letter, Plaintiff was "severe[ly] delinquen[t]" on a CashNet USA line of credit account. *Id.* The letter demanded Plaintiff pay the outstanding balance allegedly owed on her account to Blackwater and threatened legal action against Plaintiff, noting that "[a] civil judgment will immediately be reported to the credit bureaus and will be aggressively enforced." *Id.* The record indicates that Plaintiff had a CashNet USA line of credit at some point between 2007 and 2009 but paid it off by 2010. (Doc. 71-20 at 10:2–8).

### D. The FTC Action

On or about May 14, 2024, Defendant received a Civil Investigative Demand

6

("CID") from the Federal Trade Commission (the "FTC") seeking information regarding whether certain persons or entities were "engaged in deceptive acts or practices in connection with the collection or attempted collection of debts." (Doc. No. 111-5 at 156–73). The CID specifically identified Blackwater, Liberty, and Mitchell Evans, among others as the "Subject Customer or Subscriber." *Id.* at 160.

On February 24, 2025, the FTC filed a complaint (the "FTC Complaint") in the United States District Court for the Central District of California. Compl., *FTC v. Blackrock Services, Inc.*, No. 8:25-cv-00363-HDV-ADSx (C.D. Cal. Feb. 24, 2025), (Doc. No. 1). The FTC Complaint alleged that Liberty and Evans, among others (the "FTC defendants"), violated the Fair Debt Collections Practices Act, 15 U.S.C. § 1692 *et seq.* (the "FDCPA") by deceiving and threatening consumers into paying debts that consumers did not actually owe or the FTC Defendants did not have authority to collect. *Id.* at 2, 7. According to the FTC Complaint, "Defendants' fraudulent scheme includes sending consumers letters representing that (1) consumers owe some purported amount from an outstanding payday loan; (2) Defendants are law firms and plan on imminently filing a lawsuit; (3) consumers' credit scores are being damaged due to these purportedly outstanding debts; and (4) consumers can avoid a lawsuit if they pay to settle the purported debt." *Id.* at 3.

Defendant suspended Liberty's membership and access to Defendant's information on March 4, 2025. (Doc. No. 73-16 at 14). Ultimately, the FTC defendants agreed to a Stipulated Final Order for Permanent Injunction, Monetary Relief, and Other Relief in the FTC Action. Order, *FTC v. Blackrock Services, Inc.*, 8:25-cv-00363-

7

HDV-ADSx (C.D. Cal. Mar. 4, 2025), (Doc. No. 54). The court ordered the FTC defendants to pay over eight million dollars and permanently enjoined them from participating in any debt collection or debt brokering activity. *Id.*

### E. Plaintiff's Lawsuit

On August 12, 2024, Plaintiff filed this lawsuit claiming Defendant violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (the "FCRA") when it provided Liberty with a copy of her Report. (Doc. No. 1). On October 10, 2025, Defendant moved for summary judgment. (Doc. No. 70). The Court held a status conference on April 21, 2026 and questioned the parties on the motion. (Doc. No. 128).

## II.   LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Va.*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Mod. Mosaic, LTD v. Turner Constr. Co., et al.*, 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *8.929 Acres of Land*, 36 F.4th at 252 (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of

demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *see also United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022) (same). "If the movant satisfies his initial burden to demonstrate 'an absence of evidence to support the nonmoving party's case,' the burden shifts to the nonmovant to 'present specific facts showing that there is a genuine issue for trial.'" *8.929 Acres of Land*, 36 F.4th at 252 (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015)). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021) (emphasis omitted) (quoting *Anderson*, 477 U.S. at 247–48). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, inter alia, "citing to particular parts of the materials of record," Fed. R. Civ. P. 56(c)(1)(A), and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *8.929 Acres of Land*, 36 F.4th at 252 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

Still, summary judgment is not intended to be a substitute for a trial of the facts. *See Anderson*, 477 U.S. at 255. In determining if summary judgment is

9

appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (citation modified). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568–69 (4th Cir. 2015) (quoting 10A Wright & Miller's Federal Practice & Procedure § 2728 (3d ed. 1998)).

The overall inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III. DISCUSSION

Defendant moves for summary judgment on Plaintiff's claims that Defendant violated Sections 1681b and 1681e(a) of the FCRA when it provided the Report to Liberty in August 2022. The Court addresses each claim in turn.

### A. Section 1681b Claim

"Congress enacted the FCRA in 1970 to promote efficiency in the Nation's banking system and to protect consumer privacy." *TRW Inc. v. Andrews*, 534 U.S. 19, 23 (2001) (citing 15 U.S.C. § 1681(a)). In furtherance of those goals, the FCRA restricts CRAs' ability to provide consumers' credit information to third parties. In particular, under § 1681b of the FCRA, CRAs may only furnish consumer reports for "certain statutorily enumerated purposes." *TRW Inc.*, 534 U.S. at 23 (quoting § 1681e(a) then citing 15 U.S.C. § 1681b)). Relevant to this case, CRAs may furnish

10

consumer reports:

> To a person which it *has reason to believe*—
> intends to use the information in connection with a credit
> transaction involving the consumer on whom the
> information is to be furnished and involving the extension
> of credit to, or review or collection of an account of, the
> consumer[.]

15 U.S.C. § 1681b(a)(3)(A) (emphasis added).

The dispute between the parties on Plaintiff's § 1681b claim is narrow, as the parties agree on several key facts and legal conclusions. Specifically, the parties agree on the following. Defendant is a CRA within the meaning of the FCRA. (Doc. No. 128 at 11:21–12:13, 17:16–22). Liberty requested Plaintiff's Report[6] on August 19, 2022. *Id.* Defendant provided the Report to Liberty the same day. *Id.* At the time of its request, Liberty certified to Defendant that it intended to use the Report "in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of the consumer." *Id.* The parties also agree that whether Liberty ultimately used the Report for an impermissible purpose is not determinative of Defendant's liability under § 1681b. *Id; see* (Doc. No. 73 at 23–24).

Thus, the sole question before the Court is whether Defendant had "*reason to believe*" Liberty intended to use Plaintiff's Report for a permissible purpose when it furnished the Report to Liberty on August 19, 2022.[7]

---

[6] Defendant notes that it "does not concede that the CPE Report it provided to Liberty in August 2022 about [Plaintiff] is actionable under the FCRA. (Doc. No. 73 at 6 n.1). For the purposes of resolving this Motion, the Court does not opine on whether the Report is actionable under the FCRA.

[7] Defendant asserts that post-August 2022 events are irrelevant to the Court's

Defendant argues it had reason to believe Liberty would use the Report for a permissible purpose and therefore acted reasonably as a matter of law. (Doc. No. 73 at 31). According to Defendant, "blanket certifications . . . alone are sufficient to confer a reason to believe . . . ." (Doc. No. 73 at 27). Defendant further asserts that "courts consistently find that a CRA had 'reason to believe' that an individual or entity accessed a consumer report for a permissible purpose where the end user certified its limited usage; the primary business of the end user involved accessing reports for a permissible purpose; and the CRA was unaware of any impermissible use by the end user." *Id.* at 24. Defendant believes it meets this standard. The record shows Liberty made a contractual or "blanket" certification that it would only request consumer reports when it had a permissible purpose to do so. Liberty specifically certified it had a permissible purpose to request Plaintiff's Report. Liberty represented itself as a debt collector to Defendant. And at the time Defendant furnished the Report, Defendant had not received any complaints regarding Liberty or its purchase of CPE reports. (Doc. No. 73-16 at 13–14).

In response, Plaintiff argues that Defendant conflates forming a "reason to believe" with having "no reason to disbelieve." (Doc. No. 111 at 24). While acknowledging that certifications may be important, Plaintiff asserts that "mere certification by a user does not of itself provide a reason to believe . . . ." *Id.* at 27–28. According to Plaintiff, Defendant had no prior experience with Evans, and

analysis. (Doc. No. 118 at 6–7). The Court agrees. The relevant question is whether Defendant had reason to believe Liberty would use the Report for a permissible purpose when it provided it to Liberty on August 19, 2022. *See Cappetta v. GC Servs. Ltd. P'ship*, 654 F. Supp. 2d 453, 462 (E.D. Va. 2009).

Defendant's credentialing process revealed numerous "variances from the norm" that Defendant ignored. *Id.* at 26. These "red flags"—such as the results of Liberty's Dun & Bradstreet report, reference checks, and Evans' credit report—would have prevented Defendant from forming a reason to believe Liberty intended to use consumer reports for a permissible purpose. *Id.*

The Fourth Circuit has not defined the circumstances under which a CRA forms a "reason to believe."[8] In the absence of controlling guidance, both parties lean on non-binding cases and those from other circuits in support of their arguments. A review of these cases reinforces that, at its core, whether a CRA forms a "reason to believe" depends on the specific facts of the case. *See, e.g.*, *Wilson v. Sessoms*, No. 4:96CV01031, 1998 WL 35305548, at *4 (M.D.N.C. Mar. 16, 1998) (finding "reason to believe" when a user certified its permissible purpose and there was no showing that the consumer reporting agency had notice of subscriber's improper purpose for accessing plaintiff's report); *Harris v. Database Mgt. & Mktg.*, Inc., 609 F. Supp. 2d 509, 517 (D. Md. 2009) (finding "reason to believe" when the record showed an absence of "credible red flags"); *Greenhouse v. TRW, Inc.*, Civ. A. 96–1495, 1998 WL 61037, at *2–3 (E.D. La. Feb. 13, 1998) (finding "reason to believe" when the plaintiff failed to demonstrate there was any evidence "disputed or not, that [the defendant] had

---

[8] Defendant asserts that "courts unequivocally hold that the question of whether a report has been obtained for a permissible purpose is a legal one, which can be resolved on summary judgment." (Doc. No. 118 at 7) (citation modified). This argument addresses the wrong question. The relevant question is whether Defendant had "reason to believe" Liberty intended to use the Report for a permissible purpose— not whether the Report was obtained for a statutorily enumerated purpose. The Court notes that at the hearing, Defendant opined that the "reason to believe" standard "is one of reasonableness." (Doc. No. 128 at 9:16–17).

reasonable grounds to believe that [the user] would use, or did use, the consumer report provided for any impermissible purpose"). Accordingly, bright-line rules—such as certification alone provides "reason to believe"—would be inappropriate.[9]

Here, considering all the facts in evidence, the Court finds a reasonable jury could conclude that Defendant had "reason to believe" Liberty intended to use the report for a permissible purpose. However, the record also includes sufficient facts that could lead a reasonable jury to reject that conclusion. Accordingly, there is a genuine dispute of material fact, and the Court will deny summary judgment as to Plaintiff's §1681b claim.

### B. Section 1681e(a) Claim

Defendant also moves for summary judgment on Plaintiff's § 1681e(a) claim. Section 1681e requires CRAs to maintain reasonable procedures to ensure accuracy and to limit the furnishing of consumer reports to the permissible purposes enumerated in § 1681b. 15 U.S.C. § 1681e. In relevant part, § 1681e(a) provides:

> (a) Identity and purposes of credit users
>
> Every consumer reporting agency shall maintain reasonable procedures designed to avoid violations of section 1681c of this title and to limit the furnishing of consumer reports to the purposes listed under section 1681b of this title. These procedures shall require that prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose. Every consumer reporting agency shall make a reasonable effort to verify the identity of a new prospective

---

[9] At the hearing, Defendant conceded that if Defendant had information showing a business was engaged in fraud, Defendant may still be liable under § 1681b regardless of whether Defendant had received a blanket certification. *See* (Doc. No. 128 at 14:19–25, 15:1–14).

user and the uses certified by such prospective user prior to furnishing such user a consumer report. No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681b of this title.

15 U.S.C. § 1681e(a).

Defendant does not address whether it maintained reasonable procedures. Rather, Defendant argues solely that "[s]tating a claim under § 1681b is a prerequisite to asserting a claim under § 1681e(a)." (Doc. No. 73 at 32) (quoting *Baker v. TransUnion LLC*, No. CV-10-8038-PCT-NVM, 2010 WL 2104622 (D. Ariz. May 25, 2010)). Because Defendant's only argument in support of its Motion for Summary Judgment on the § 1681e(a) claim relies on the Court granting summary judgment on its § 1681b claim, Defendant's Motion for Summary Judgment as to the § 1681e(a) claim will also be denied.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 70) is **DENIED**; and this case shall proceed to trial on the merits in the absence of a voluntary resolution of the dispute among the parties.

**SO ORDERED.**

Signed: June 2, 2026

Matthew E. Orso
United States District Judge

15