UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:24-CV-01069-MEO-DCK

| | |
|---|---|
| **CONNIE L. JACKSON**, on behalf of herself and all similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>**TRANS UNION, LLC,**<br><br>Defendant. | **MEMORANDUM & ORDER** |

**THIS MATTER** is before the Court on Defendant Trans Union, LLC's ("TransUnion") Motion to Decertify the Class (Doc. No. 138), Motion to Stay Class Notification Deadlines (Doc. No. 140), and Motion for Judicial Settlement Conference (Doc. No. 142). For the reasons set forth below, the Court will deny the Motion to Decertify and deny without prejudice the Motion for Judicial Settlement Conference. The Court orally granted the Motion to Stay Class Notification Deadlines at the November 5 hearing, pending the Court's resolution of the decertification motion.

## I. BACKGROUND

Plaintiff Connie L. Jackson sued TransUnion on August 12, 2024, in the Eastern District of Virginia, which transferred the case here on December 11, 2024. (Doc. No. 1). She alleges that TransUnion violated 15 U.S.C. §§ 1681b and 1681e(a) by selling consumer reports to Liberty Credit Management ("Liberty") without reason to believe Liberty had a permissible purpose. (Doc. No. 53 ¶¶ 38–65). On behalf of the

class, she seeks statutory and punitive damages under 15 U.S.C. § 1681n and reserves individual actual-damages claims. *Id.* ¶¶ 49 n.2, 64 n.3.

The reports at issue are TransUnion's collection prioritization engine ("CPE") reports, which Liberty requested from TransUnion under the guise of pursuing collection efforts. (Doc. No. 139 at 8–9). According to TransUnion's CPE user guide, requesting a CPE report triggers a soft hit on the consumer's credit report. (Doc. No. 73-12 at 5).

On June 2, 2026, the Court certified a class of "[a]ll natural persons residing in the United States (a) who were the subject of a CPE report sold by [TransUnion]; (b) on or after August 12, 2019 and continuing through the date on which the class list is prepared; (c) in which the [TransUnion] subscriber showing in [TransUnion]'s records is Liberty Credit Management." (Doc. No. 129 at 20). The same day, the Court denied TransUnion's motion for summary judgment. (Doc. No. 130). On July 6, 2026, the Court approved the parties' jointly proposed Notice Plan (Doc. Nos. 131, 132) and set trial for January 25, 2027.

On August 25, 2026, TransUnion filed the three motions now before the Court. The Court held a hearing on the motions on November 5, 2026.

## II. LEGAL STANDARD

"An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). After certification, "the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). A court must decertify "if it

becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate." *Stott v. Haworth*, 916 F.2d 134, 139 (4th Cir. 1990). Courts generally exercise this power upon "some significant intervening event," such as a change in controlling law or new evidence. 7AA *Wright & Miller's Federal Practice and Procedure* § 1785.4 n.22 (3d ed.); *see Bell v. Disner*, 2018 WL 296035, at *3 (W.D.N.C. Jan. 4, 2018), *aff'd sub nom. Bell v. Brockett*, 922 F.3d 502 (4th Cir. 2019) ("[T]he Court may not disturb its prior certification absent some significant intervening event or a showing of compelling reasons to reexamine the question.") (internal citation and quotation marks omitted). The parties dispute which side bears the burden on decertification. The Court need not resolve that dispute, as it would not change the outcome.

Federal courts are courts of limited jurisdiction. They "possess only the jurisdiction authorized them by the United States Constitution and by federal statute." *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009). There is no presumption that jurisdiction exists, *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999), and the plaintiff bears the burden of establishing it. *Evans v. B.F. Perkifns Co.*, 166 F.3d 642, 647 (4th Cir. 1999). Because the question goes to the Court's power to act, it must be resolved before the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Jurisdiction cannot be conferred by consent or waived, *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004), and if it is lacking, "the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Standing is a threshold jurisdictional issue. *CGM,*

*LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) ("Article III gives federal courts jurisdiction only over cases and controversies, and standing is an integral component of the case or controversy requirement.") (internal citation and quotation marks omitted).

## III. DISCUSSION

### A. MOTION TO DECERTIFY THE CLASS

TransUnion raises two potential grounds for decertification: (1) the class lacks classwide Article III injury, and (2) under *R.I. Office of General Treasurer v. Boeing Co.*, 182 F.4th 422 (4th Cir. 2026), individualized statutory-damages questions defeat predominance.

#### 1. Timing

TransUnion candidly acknowledges that at certification "[n]either party addressed whether absent class members could establish Article III injury-in-fact, and neither addressed whether damages were susceptible to classwide proof." (Doc. No. 139 at 10–11). Discovery closed in October 2025, more than seven months before the Court ruled on certification, and TransUnion draws its factual premises from exhibits to its October 2025 summary-judgment motion. At certification, TransUnion also told the Court that "[t]he issue here is not about the 'amount of statutory damages to award' to class members." (Doc. No. 44 at 23). The Court welcomes the fresh perspective of TransUnion's additional counsel, but this history weighs against revisiting certification. Nevertheless, standing implicates the Court's jurisdiction, and Rule 23 imposes a continuing duty. Therefore, the Court addresses both

arguments on the merits.

### 2. Article III Injury

"No concrete harm, no standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021). An intangible harm is concrete when it bears "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* at 424 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The inquiry does not require "an exact duplicate in American history and tradition." *Id.*

#### a. Intrusion Upon Seclusion is a Traditionally Recognized Harm

The Supreme Court has already identified the relevant tradition. Among the intangible harms that qualify as concrete, *Ramirez* lists "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* at 425. Because TransUnion disputes whether the harm here fits that tradition, the Court traces the tort from its text and origins to the present.

The tort's name describes the harm. In the early Republic, "intrusion" meant "[t]he action of thrusting in, or of entering into a place or state without invitation, right or welcome," or "[e]ncroachment; entrance without right on the property or possession of another." Noah Webster, *An American Dictionary of the English Language* (1828) (defining "intrusion"). Intrusion, in this ordinary sense, is an uninvited entry into what belongs to another. It matters not whether anything is published to the broader world. The modern formulation retains this meaning: one who "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns" is liable if "the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977). The

words "or otherwise" and "private affairs or concerns" extend the tort beyond physical places to a person's private information.

This personal interest that the tort protects predates the Republic. English law held that "the house of every one is to him as his castle and fortress." *Semayne's Case* (1604) 77 Eng. Rep. 194, 195 (KB). In *Entick v. Carrington*, the English Court of Common Pleas sustained a private damages action against officers who entered a home and seized private papers, "for papers are often the dearest property a man can have." (1765) 95 Eng. Rep. 807, 817–18 (CP). And Blackstone condemned "eaves-droppers, or such as listen under walls or windows or the eaves of a house, to hearken after discourse." 4 William Blackstone, *Commentaries* 168 (1795). By the Founding, then, the common law treated uninvited entry into a person's private domain—his house, his papers, or his conversations—as a wrong the law would redress.

American courts carried that tradition forward. In *De May v. Roberts*, 9 N.W. 146 (Mich. 1881), the Michigan Supreme Court considered a case in which a physician's untrained, uninvited companion had accompanied the physician to the plaintiff's home and observed the plaintiff give birth. The court upheld the plaintiff's recovery, explaining that she "had a legal right to the privacy of her apartment at such a time, and the law secures to her this right by requiring others to observe it, and to abstain from its violation." *Id.* at 149. Leading legal scholars of this era described the underlying interest as the right "to be let alone." Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 195 (1890) (quoting

Thomas M. Cooley, *Cooley on Torts* 29 (2d ed. 1888)). Courts then applied the tort to eavesdropping by new means—such as wiretapping phone lines—a modern outgrowth of the wrong Blackstone described. *See Rhodes v. Graham*, 37 S.W.2d 46, 47 (Ky. 1931) ("The evil incident to the invasion of the privacy of the telephone is as great as that occasioned by unwarranted publicity in newspapers and by other means of a man's private affairs for which courts have granted the injured person redress.").

By 1960, Dean William Prosser identified "[i]ntrusion upon the plaintiff's seclusion or solitude, or into his private affairs" as the first of four established privacy torts. William L. Prosser, *Privacy*, 48 Calif. L. Rev. 383, 389 (1960). Four years later, the Supreme Court of New Hampshire applied that tort to a listening device that had been concealed in the plaintiffs' bedroom, explaining that intrusion "is not limited to a physical invasion of his home or his room or his quarters." *Hamberger v. Eastman*, 206 A.2d 239, 241 (N.H. 1964). The court added that the tort had been "extended to eavesdropping upon private conversations by means of wire tapping and microphones." *Id.* (quoting William L. Prosser, *Handbook of the Law of Torts* § 112, at 833 (3d ed. 1964)).

This tradition has long reached a person's financial affairs. The Restatement explains that an intrusion may occur through an "investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents." Restatement (Second) of Torts § 652B cmt. b. And "[t]he intrusion itself makes the defendant subject to

liability, even though there is no publication." *Id.* That reflects the common law's settled view that the invasion of a right is itself the injury: "The law tolerates no farther inquiry than whether there has been the violation of a right." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 288 (2021) (quoting *Webb v. Portland Mfg. Co.*, 29 F. Cas. 506, 508 (C.C.D. Me. 1838) (opinion of Story, J.)).

Against this backdrop, Congress enacted the FCRA "to promote efficiency in the Nation's banking system and to protect consumer privacy." *TRW Inc. v. Andrews*, 534 U.S. 19, 23 (2001). The legislature found a "need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4). It then limited the purposes for which an agency may furnish a report. *Id.* § 1681b(a). That judgment is "instructive and important," *Spokeo*, 578 U.S. at 341, though the Court must still decide for itself whether the harm bears a close relationship to a traditionally recognized one, *Ramirez*, 594 U.S. at 425–26.

Courts applying *Spokeo* and *Ramirez* continue to recognize that tradition in cases under modern privacy statutes: "The common law has long recognized actions at law against defendants who invaded the private solitude of another." *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (opinion of Barrett, J.). The Fourth Circuit has done the same. In *Garey v. James S. Farrin, P.C.*, the court held that obtaining personal information in violation of a federal privacy statute inflicts a concrete privacy injury, focusing on the "types of harms protected at common law, not the precise point at which those harms become actionable." 35 F.4th 917, 921–22 (4th

Cir. 2022) (quoting *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019)). The Seventh Circuit applied the same principle to the type of information at issue here, holding that unauthorized access to a propensity-to-pay score is a concrete injury because the analogy turns on kind, not degree. *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1192 (7th Cir. 2021). The en banc Fourth Circuit has since relied on *Persinger*, quoting it for the principle that whether a plaintiff "would prevail in a lawsuit for common law invasion of privacy is irrelevant," *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin. ("AFSCME")*, 172 F.4th 361, 369 (4th Cir. 2026) (en banc) (quoting *Persinger*, 20 F.4th at 1192).[1] Courts in this District have agreed. *See, e.g.*, *Parsons v. United Collections Bureau, Inc.*, 2022 WL 17095204, at *2 (W.D.N.C. Nov. 21, 2022) (finding standing for a § 1681b claim).

The harm alleged here falls within that tradition. At the request of a buyer with no permissible purpose, TransUnion examined each class member's credit file, reduced it to a score predicting whether that member would pay a debt, and sold the result to the buyer. That is the same kind of harm as the "examin[ation of] his private bank account" the Restatement describes: an examination of a person's private financial affairs for someone with no right to it. Restatement (Second) of Torts § 652B cmt. b.

**b. The Alleged Intrusion's Level of Offensiveness**

The intrusion alleged here also must satisfy the tort's offensiveness element,

---

[1] The AFSCME court explained that "it is enough that the injury plaintiffs have identified 'pose[s] the same *kind* of harm that common law courts recognize.'" *Id.* (quoting *Gadelhak*, 950 F.3d at 463) (emphasis in original).

which the common law measures objectively. Because *Ramirez* asks whether a harm was "traditionally" recognized, 594 U.S. at 424, the common law's own measure governs: the sensibilities of an ordinary person, not a particular plaintiff's reaction. The first Restatement asked whether the intrusion "would be offensive to persons of ordinary sensibilities." Restatement of Torts § 867 cmt. d (1939); *see Hamberger*, 206 A.2d at 242 (applying that standard). The Restatement (Second) carries it forward as whether the intrusion "would be highly offensive to a reasonable person," Restatement (Second) of Torts § 652B. And the en banc Fourth Circuit in *AFSCME* applied this objective offensiveness element in the standing context, framing the standing inquiry around whether the alleged access was an "unlawful and highly offensive 'intrusion,'" and treating it as offensive because, on the plaintiffs' merits theory, the access to sensitive personal information was unauthorized. *AFSCME*, 172 F.4th at 369–70. The question is how an ordinary person would regard TransUnion's examination of her credit file at the request of a buyer that lacked a permissible purpose, and the sale of the resulting report to that buyer.

The Court begins its inquiry with what the CPE report contained. By TransUnion's own account, a CPE report virtually always included the consumer's name, address, date of birth, Social Security number, and employer, along with a proprietary "recovery score"—a number between 300 and 850 that "predicts the likelihood a debt collector will recover on the account." (Doc. No. 139 at 9). Some reports also disclosed bankruptcy information. *Id.* The recovery score is not a neutral fact. It is TransUnion's appraisal of the consumer's finances, derived from a review

of her credit file, that tells a collector how likely it is to recover from her.

A reasonable person would strongly object to that examination and sale for three reasons. First, each request caused an examination of the consumer's private financial records. The common law has long treated a person's financial affairs as private; it considers "examining his private bank account" a paradigm intrusion. Restatement (Second) of Torts § 652B cmt. b. As TransUnion's user guide reflects, each request for a CPE report triggered a soft hit on the consumer's credit report. (Doc. No. 73-12 at 5). To produce each recovery score, then, TransUnion examined the consumer's credit file for Liberty's purposes and delivered the result to Liberty—a modern counterpart of the examination the Restatement describes. Because the intrusion lies in that examination, it does not depend on whether Liberty already knew a consumer's Social Security number—a point the record does not resolve. *See* (Doc. No. 139 at 8–9).

Second, what TransUnion delivered was a confidential assessment of the consumer's finances. Congress defined a "consumer report" by its information "bearing on a consumer's credit worthiness, credit standing, credit capacity," and related characteristics, 15 U.S.C. § 1681a(d)(1), and it barred agencies from furnishing such reports except for enumerated purposes, *id.* § 1681b(a).[2] A recovery score is that kind of information—derived from the consumer's credit file and reduced to a single number designed to direct collection efforts.

---

[2] While Congress's judgment is "instructive and important," it cannot stand on its own, as it "does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm." *Ramirez*, 594 U.S. at 425–26.

Third, the buyer had no lawful reason to receive it. Plaintiff contends that Liberty—an entity later shut down by the Federal Trade Commission—did not have a permissible purpose. *See* (Doc. Nos. 129 at 4–5; 130 at 4–6). For standing purposes, the Court accepts as valid Plaintiff's theory that TransUnion lacked reason to believe Liberty had a permissible purpose. *FEC v. Cruz*, 596 U.S. 289, 298 (2022); *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"). A reasonable person would expect that a lender reviewing her application might see her credit information; that use is authorized by Congress. *See* 15 U.S.C. § 1681b(a)(3)(A). But she would not expect her credit file to be examined, and an appraisal of her collectability sold, at the request of a buyer with no lawful reason to have it. And the report did not deliver the appraisal alone. It attached her Social Security number, date of birth, and employer—identifiers the en banc Fourth Circuit treated as sensitive in *AFSCME*, 172 F.4th at 365—though the record does not show whether, or how often, Liberty already possessed that information. Nor is this case like *O'Leary v. TrustedID, Inc.*, in which the plaintiff typed six digits of his own Social Security number into a website and nothing was disclosed to anyone. 60 F.4th 240, 242 (4th Cir. 2023); *see AFSCME*, 172 F.4th at 369 n.6 (reading *O'Leary* narrowly). No one in *O'Leary* examined anything. Here, each request caused an examination of the consumer's credit file, and the result was sold to a buyer with no lawful reason to have it. For each of these reasons, a reasonable person would find the transaction highly offensive.

The material facts—that each request caused TransUnion to examine the consumer's credit file, what the resulting CPE report contained, and to whom TransUnion sold it—are undisputed. Applying the objective standard to those facts, the Court concludes as a matter of law that examining a consumer's credit file at the request of a buyer without a permissible purpose, and selling the resulting report to that buyer, would be highly offensive to a reasonable person. That harm bears a close relationship to intrusion upon seclusion and is a concrete injury.

**c. TransUnion's Authorities Do Not Compel a Different Result**

Citing the Supreme Court's decision in *Ramirez*, TransUnion argues that the act of furnishing a report to a third party does not, by itself, inflict a concrete harm. (Doc. No. 152 at 12). That may be true, but it does not help TransUnion here. The class members with standing in *Ramirez* had been the subjects of third-party reports that falsely labeled them potential terrorists, drug traffickers, or serious criminals—a harm the Supreme Court analogized to defamation. 594 U.S. at 432–33. But Plaintiff here relies on a different traditional harm—intrusion upon seclusion—which turns on the nature of the intrusion, not on publicity or falsity. Restatement (Second) of Torts § 652B cmts. a, b. And the harm here does not rest on furnishing alone. It lies in the examination each request caused and the delivery of the result to a buyer with no permissible purpose.

TransUnion relies most heavily on *AFSCME*, the en banc Fourth Circuit decision. There, the court treated the alleged access as an "unlawful and highly offensive 'intrusion'" because, on the plaintiffs' merits theory, it was unauthorized,

172 F.4th at 369–70, and found standing where government employees had gained unauthorized access to "sensitive information" including "Social Security numbers, citizenship status, birth dates, bank account numbers, tax information, medical history, and more," *id.* at 365, 369. The opinion "conclude[d] that disclosing plaintiffs' members' personally identifiable information to DOGE inflicts a harm that is a close analogue to the common law tort of intrusion upon seclusion." *Id.* at 368 (citation modified). The intrusion here is different in character but no less invasive—it was targeted rather than generalized, because each request triggered a soft hit on a specific consumer's credit report; its product was sold for profit to a buyer with no lawful reason to have it; and it was aimed at a confidential assessment of each person's finances. As such, *AFSCME* does not assist TransUnion.[3]

At the hearing, TransUnion argued that the only relevant harm involves what TransUnion disclosed to Liberty and that TransUnion disclosed only a single number (albeit based on financial information). The Court sees it differently. First, intrusion

---

[3] TransUnion draws contrary language from *AFSCME*'s non-majority opinions. *See* (Doc. No. 139 at 17–18 (citing 172 F.4th at 387 (Richardson, J., concurring in the judgment); 172 F.4th at 391 (King, J., concurring in part, dissenting in part, and dissenting from the judgment))). As Judge Richardson framed the issue, "Plaintiffs at most allege[d] that a handful of additional government employees now have generalized access to a vast database that includes their personal information." *AFSCME*, 172 F.4th at 387 (Richardson, J., concurring in the judgment). The Court does not discount this reasoning. But the en banc majority held that the disclosure there bore a close relationship to intrusion upon seclusion. *AFSCME*, 172 F.4th at 368. And even on the concurrence's terms, the intrusion here did not involve generalized access. Liberty paid for reports on specific consumers, and TransUnion answered each request by running a soft hit on that consumer's credit report and sending back a CPE report. And on Plaintiff's theory, TransUnion did this without reason to believe Liberty had a permissible purpose. That is the kind of targeted inquiry into private affairs the tort has long redressed.

upon seclusion does not depend on disclosure. The tort is complete upon an "investigation or examination into [another's] private concerns," Restatement (Second) of Torts § 652B cmt. b, and "does not require the tortfeasor to go on to misuse the information it learns or disseminate it to the public," *AFSCME*, 172 F.4th at 369. Each of Liberty's requests caused TransUnion to examine the consumer's credit file, as the soft hit reflects. TransUnion's authority to maintain consumers' files for its own permissible purposes does not make an examination undertaken at the request of, and for, a buyer without a permissible purpose a lawful internal use. Second, *AFSCME* did not require that the outsider actually view the records; the harm was "granting unauthorized and unwarranted access . . . ." *Id.* at 369. TransUnion did more: it performed the examination itself and delivered the result. Third, even measured by the disclosure alone, the recovery score is far from a standalone, arbitrary number—why else would a collections firm pay for it? TransUnion does not dispute that the CPE report is a consumer report, which by definition bears on a consumer's "credit worthiness, credit standing, [or] credit capacity," 15 U.S.C. § 1681a(d)(1), and it describes the score as derived from the consumer's credit information, (Doc. No. 177 at 61:2–14). A summary of a person's credit history, sold to a stranger, conveys the substance of that history. *See Persinger*, 20 F.4th at 1192.

TransUnion also cites two district court cases: *Asbury v. Credit Corp Solutions, Inc.*, No. 1:21-cv-650, 2022 WL 377011 (M.D.N.C. Feb. 8, 2022), and *Brown v. Alltran Financial, LP*, No. 1:21-cv-595, 2022 WL 377001 (M.D.N.C. Feb. 8, 2022). Each held that a debt collector's sharing of information about a debt with a third-party vendor

did not cause a harm closely related to intrusion upon seclusion. Those Fair Debt Collection Practices Act cases involved the handling of debt information incident to efforts to collect the corresponding debts. This case, by contrast, involves a consumer reporting agency's furnishing of reports that Congress expressly restricted to protect "the consumer's right to privacy." 15 U.S.C. § 1681(a)(4); *see id.* § 1681b.[4]

To be sure, TransUnion's decertification arguments make this a close question. A CPE report reveals less than a full credit report: it contains no itemized, account-level information. And the Seventh Circuit itself acknowledged that disclosure of a propensity-to-pay score might be only "slightly offensive." *Persinger*, 20 F.4th at 1192 n.3. The Court's holding is accordingly narrow. The Court does not hold that every disclosure of a credit-derived number is a concrete injury. The Court holds that examining a consumer's credit file at the request of a buyer without a permissible purpose, and selling the resulting consumer report to that buyer, along with the consumer's social security number and other personally identifying information, bears a close relationship to intrusion upon seclusion.

Article III therefore presents no barrier to continued certification.

### 3. Statutory Damages and *Boeing*

Next, TransUnion contends that the Fourth Circuit's decision in *Boeing* requires a Rule 23 plaintiff to explain "how damages will be

[4] TransUnion also urges the distinction that *Persinger* was brought against the party that obtained the report, not the party that furnished it. (Doc. No. 152 at 15 n.3). That distinction carries less weight after *AFSCME*, which found the relevant harm in the agency's "granting unauthorized and unwarranted access to a person's sensitive personal information." 172 F.4th at 369.

measured . . . specific[ally]" so the court can assess predominance. (Doc. No. 152 at 6 (quoting 182 F.4th at 440–41)). But *Boeing* does not govern the facts of this case. *Boeing* arose in a securities-fraud class action and addressed models of compensatory loss. 182 F.4th at 428. The inquiry here is materially different.

This case involves statutory damages fixed by Congress itself: under § 1681n, willful violations justify "damages of not less than $100 and not more than $1,000." 15 U.S.C. § 1681n(a)(1)(A). Plaintiff proposes that the jury select a single per-violation figure within that range, with the number of violations drawn from TransUnion's records. (Doc. No. 150 at 21–22). The Fourth Circuit has approved this approach:

> [W]here . . . the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner, the individual statutory damages issues are insufficient to defeat class certification under Rule 23(b)(3).

*Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 273 (4th Cir. 2010); *see also Berry v. Schulman*, 807 F.3d 600, 609 (4th Cir. 2015) (observing that on a finding of liability, "every class member would be entitled uniformly to the same amount of statutory damages, set by rote calculation"); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 427–28 (4th Cir. 2003) ("Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification."); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (Rule 23(b)(3) predominance may be satisfied even though damages must be tried separately); *Clark v. Trans Union, LLC*, 2017

WL 814252, at *15 n.31 (E.D. Va. Mar. 1, 2017) (rejecting the same argument in an FCRA class action). *Boeing* does not purport to overrule or conflict with these decisions, and this Court does not read it to do so.

TransUnion also relies on *Soutter v. Equifax Information Services, LLC*, in which the Fourth Circuit observed that statutory damages "typically require an individualized inquiry." 498 F. App'x 260, 265 (4th Cir. 2012). On remand, however, the district court there recertified an FCRA statutory-damages class—reading the Fourth Circuit's decision alongside *Stillmock*. 307 F.R.D. 183, 216–17 (E.D. Va. 2015).

Any variation in class members' actual harm does not change the analysis. The class seeks only statutory and punitive damages. (Doc. No. 53 ¶¶ 49 n.2, 64 n.3). A representative plaintiff may forgo actual damages to achieve certification. *Stillmock*, 385 F. App'x at 273 ("[A] representative plaintiff must be allowed to forego claims for compensatory damages in order to achieve class certification." (quoting *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006))). And the Fourth Circuit has approved an FCRA class structure that separated statutory damages from actual damages. *Berry*, 807 F.3d at 607. In *Berry*, the settlement itself preserved class members' individual actual-damages claims. *Id.* Here, the protection takes a different form. This is a Rule 23(b)(3) class, and any member who values her actual damages more highly may request exclusion. Fed. R. Civ. P. 23(c)(2)(B)(v). TransUnion argued at the hearing that the classes in the cases Plaintiff cites excluded members with actual damages. The opt-out right serves that function here: each member with actual damages decides for herself whether to stay in the class or pursue those damages on

her own. And TransUnion did not contest adequacy at certification.

To remove any doubt about the scope of the class's claims, the Court clarifies that the class seeks only statutory and punitive damages under 15 U.S.C. § 1681n(a)(1)(A) and (a)(2). It does not seek actual damages. *See* Fed. R. Civ. P. 23(c)(1)(B). A class member who believes her actual damages exceed what the class seeks may protect that remedy by requesting exclusion, and the reset class notice must say so. Fed. R. Civ. P. 23(c)(2)(B)(v).

For these reasons, the Court denies the Motion to Decertify.

**B. MOTION TO STAY CLASS NOTIFICATION DEADLINES**

The Court previously granted TransUnion's Motion to Stay pending the Court's resolution of the decertification motion. In light of the Court's resolution of the decertification motion, the stay will be lifted. Furtfher, because the original notice deadlines passed while the motion was pending, the Court will reset them as set forth below. To allow the reset notice period and exclusion window to close well before trial, the Court continues trial from January 25, 2027, to March 15, 2027.

The reset notice shall clearly inform class members that the class seeks only statutory and punitive damages and that members who believe their actual damages exceed that potential recovery may request exclusion from the class.

**C. MOTION FOR JUDICIAL SETTLEMENT CONFERENCE**

Finally, TransUnion asks the Court to order a judicial settlement conference under Local Civil Rule 16.3(d). (Doc. No. 142). Plaintiff does not oppose settlement discussions but asks the Court to attach conditions. The Court will deny this motion

without prejudice. If the parties desire a judicial settlement conference, they shall file within ten days of this Order a joint request for judicial settlement conference, including any conditions already agreed upon. Should the parties file that request, the Court will schedule a conference at the earliest convenience of the parties and the available presiding judicial officer.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion to Decertify the Class (Doc. No. 138) is **DENIED**;
2. The class certified in the Court's June 2, 2026 Order (Doc. No. 129) seeks only statutory and punitive damages under 15 U.S.C. § 1681n and does not seek actual damages; the reset class notice **SHALL SO STATE** and **SHALL ADVISE** members that they may request exclusion if they believe their actual damages exceed the potential recovery for statutory and punitive damages;
3. The stay on class notification and related deadlines is hereby **LIFTED**, and the Court resets the class-notice deadlines in its July 6, 2026 Order (Doc. No. 132) as follows:
    a. Defendant shall produce the class list with last-known mailing addresses to the administrator by **November 20, 2026.**
    b. Notice Date: **December 15, 2026**.
    c. Exclusion deadline: **February 16, 2027**.
    d. The administrator shall file its declaration of compliance and final exclusion list by **March 1, 2027**.
4. Trial is continued to **March 15, 2027**.

5. Defendant's Motion for Judicial Settlement Conference (Doc. No. 142) is **DENIED WITHOUT PREJUDICE**. The parties may file a joint request for a judicial settlement conference, including any agreed conditions, within ten days of this Order.

**SO ORDERED.**

Signed: November 12, 2026

Matthew E. Orso
United States District Judge